

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00564-CR

SAMUEL JONES                                                    APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

------------

### FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In two issues, Appellant Samuel Jones appeals his conviction for aggravated robbery with a deadly weapon, arguing that he received ineffective assistance of counsel and that he was denied due process because two witnesses, Don Cocanaugher and Rebecca Self, were absent from his trial. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

Jones was charged with committing the aggravated robbery with a deadly weapon of Dr. Joseph Surdacki based on the events of July 23, 2006, recounted below in our discussion of Jones's issues.

On October 13, 2008, Jones's counsel requested subpoenas for Cocanaugher and Self to appear on October 16, 2008. Jones's trial began on October 14, 2008, and concluded on October 16, 2008, at around 10:09 a.m., when the jury assessed Jones's punishment of life imprisonment and the trial court entered judgment on the verdict.[2] At 1:26 p.m. that day, the constable filed the return of the subpoenas for Cocanaugher and Self, indicating that they could not be served because their addresses for service were not in Denton County.

After we dismissed Jones's appeal for want of jurisdiction, *see Jones v. State*, No. 02-08-00465-CR, 2009 WL 160945, at *1 (Tex. App.—Fort Worth Jan. 22, 2009, no pet.) (mem. op., not designated for publication), the court of criminal appeals granted Jones an out-of-time appeal. *See Ex parte Jones*, No. AP-76454, 2010 WL 4679958, at *1 (Tex. Crim. App. Nov. 17, 2010) (not designated for publication).

Jones filed a pro se notice of appeal and application for appointment of appellate counsel. He also filed a pro se motion for new trial, alleging that his

---

[2]The trial court also granted the State's motion to cumulate Jones's life sentence, stacking it on top of the life and ninety-nine-year sentences he had received for related convictions in Collin County.

trial counsel had been ineffective for not interviewing Cocanaugher and Self and complaining that the trial court had abused its discretion by denying his motion for continuance to obtain Cocanaugher and Self as witnesses.

Jones attached an unsworn statement to his motion for new trial, in which he set forth his belief that Cocanaugher and Self would have corroborated his claims and defenses and that he would not have been compelled to testify on his own behalf at trial if they had been there, and he argued that the trial court denied the motion for continuance "in-order to injure [his] 14th Amendment Constitutional right to Due Process, [his] right to present witnesses in [his] behalf, and the right to a fair and impartial trial."[3] Counsel was appointed for Jones's appeal, and this appeal followed.

### III. Ineffective Assistance of Counsel

In his second issue, Jones argues that he was denied effective assistance of counsel when his trial counsel failed to investigate or interview Cocanaugher and Self on his behalf in preparation for trial, failed to ensure that they were subpoenaed, and failed to timely file a motion for new trial and notice of appeal after his conviction.

We overrule the last two portions of this issue because the court of criminal appeals has already addressed them by granting Jones's petition for an out-of-time appeal. *See Mestas v. State*, 214 S.W.3d 1, 4 (Tex. Crim. App. 2007)

---

[3]There is no indication that Jones's motion was ever presented to the trial court or that the trial court ruled on it. *See* Tex. R. App. P. 21.6.

3

(stating that the effect of granting an out-of-time appeal is that it restores the defendant to the position he occupied immediately after the trial court signed the judgment of conviction, putting him in the position of being able to file a timely motion for new trial and notice of appeal); *Burrus v. State*, 266 S.W.3d 107, 116 (Tex. App.—Fort Worth 2008, no pet.) (stating, with regard to the court of criminal appeals's grant of an out-of-time appeal, that "[s]ince Burrus was returned to a point at which she could give notice of appeal, she was also at a point where she could file a motion for new trial.").

With regard to the first part of his second issue, Jones argues that it is "inconsevable [sic] to believe that an attorney would believe that the only two witnesses who observed the offense other than the complainant and the defendant would not have anything to add to appellant's defense[,] especially when appellant faced a potential life sentence."[4]

## A. Standard of Review

To establish ineffective assistance of counsel, the appellant must show by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have

---

[4]Because Jones states that regardless of when his counsel requested the subpoenas, "the result would still be the same in that the subpoenas would have been returned due to the witnesses['] addresses being outside Denton County," we will not address his failure-to-subpoena argument. *See* Tex. R. App. P. 47.1.

been different.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009).

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).  The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error.  *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065.  Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct fell within a wide range of reasonable representation.  *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim.  *Salinas*, 163 S.W.3d at 740; *Thompson*, 9 S.W.3d at 813–14.  "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions."  *Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63).  To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness."  *Id.* (quoting *Thompson*, 9 S.W.3d at 813).  It is not appropriate for an appellate court to

5

simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, the appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding in which the result is being challenged. *Id.* at 697, 104 S. Ct. at 2070.

An appellant claiming ineffective assistance of counsel at trial must identify the allegedly erroneous acts and omissions of counsel. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066; *Cooper v. State*, 333 S.W.3d 859, 867 (Tex. App.—Fort Worth 2010, pet. ref'd). The appellate court then determines whether, in light of all the circumstances, these identified acts or omissions were outside the wide range of competent assistance. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066; *Cooper*, 333 S.W.3d at 867.

## B.  Totality of the Representation

### 1.  The State's Evidence

At around 2:50 p.m. on July 23, 2006, Jones carjacked Baki Sulanc at gunpoint in a Lowe's parking lot in Carrollton as Sulanc opened the door to his

6

gold Lexus SUV. Sulanc cried out for help as he struggled with Jones. Paul Palnau heard Sulanc and went to assist him. Jones pointed his gun at Palnau before fleeing the scene in the gold SUV.

During Jones's flight, the gold SUV rolled over into a ditch. Dr. Surdacki saw the gold SUV in the ditch and stopped to offer assistance. Jones opened the door of Dr. Surdacki's black SUV, pointed a gun at Dr. Surdacki's head, and told him to get out of the vehicle. Dr. Surdacki said that he was afraid Jones was going to shoot him, so he exited the vehicle. Jones then got into the vehicle and fled the scene.

Around 3:10 p.m., Carrollton Police Officer Tim Adamo drove into Denton County, saw the overturned gold SUV, and met with Dr. Surdacki and some bystanders. Officer Adamo stated that Dr. Surdacki was emotionally shaken and upset and told him that Jones had pointed a gun at his head and had stolen his vehicle.

When Palnau learned about the SUV rollover, he went to find out what he could about it for Sulanc. He arrived at the rollover scene and encountered Dr. Surdacki, who was "extremely distraught," shaking, trembling, and upset. Palnau said that when he asked Dr. Surdacki if he was all right, Dr. Surdacki told him, "He just put his gun to my head and told me to get out of the car. I thought he was going to kill me and I wasn't going to see my wife [again]. I thought I was

going to die."[5]  During cross-examination, Palnau denied that Dr. Surdacki had said anything to him about Jones trying to trick him out of his vehicle and that Dr. Surdacki told him only that Jones had put a gun to his head and told him to get out of the car.

A couple—Cocanaugher and Self—had pulled up in a pickup truck as Jones drove away.  Dr. Surdacki said that they were "just literally braking and stopping as [Jones] was taking off in [Dr. Surdacki's SUV]."  Dr. Surdacki stated that the couple told him that it looked as if he had rolled the gold SUV and Jones had stopped to ask him if he needed help.  During cross-examination by Jones's counsel, Officer Adamo said that he took statements from Cocanaugher and Self, that both witnesses told him that they drove up and saw a black person get in the car and head off, and that neither said anything about a gun.

Not long after stealing Dr. Surdacki's SUV, Jones approached Eduardo Jiminez's vehicle at a truck stop in Fairview and asked Jiminez for a "jump."  Jiminez told Jones that he did not have jumper cables, and Jones said that he had cables.  When Jiminez's wife turned their car towards the black SUV, Jones pointed his gun at Jiminez.  Jiminez grabbed at the gun, and he and Jones

---

[5]Jones's trial counsel raised a hearsay objection, but the trial court allowed Palnau's testimony about Dr. Surdacki's statement under the excited utterance exception for hearsay.  *See* Tex. R. Evid. 803(2).

8

wrestled while Jiminez yelled for his wife to take the car and leave. Jiminez's wife took off, and Jones ran to Christie Bundren's eighteen-wheeler.[6]

Bundren testified that Jones opened the driver's side door of the truck, jumped in, put a gun to her head, and told her, "Drive, bitch, or I'll kill you." During the five-hour ordeal that followed, Jones kept the gun pointed at Bundren's waist. Jones had Bundren drive him to his sister's house while the police chased them. Police surrounded the eighteen-wheeler while Jones dragged Bundren into the truck's sleeper area and used Bundren's cell phone to talk with SWAT team negotiators. Eventually, Jones had Bundren return to the driver's seat, and she resumed driving with the police still following.

The truck stopped after the police spiked its tires and shot out its radiator. After the truck stopped, Jones pulled Bundren back into the sleeper area, keeping the gun to her head. Bundren begged Jones not to shoot her, and then she managed to grab the gun and jump out of the truck.

Carrollton Police Officer David Taylor dusted Sulanc's SUV for fingerprints and testified that Jones's fingerprints matched the latent prints that he had found. Officer Taylor also found a spring inside the gold SUV that was consistent with the shape of a spring for an ammunition magazine. Denton County Deputy Sheriff Jeff Coats processed Dr. Surdacki's SUV and found a .380 semi-automatic magazine that had come apart because it was missing its push spring,

---

[6]Jiminez and his wife had gone to the truck stop to meet Bundren, his mother-in-law.

9

as well as two or three loose bullets that fit the magazine. Collin County Deputy Sheriff Diane Stubbs testified that she processed Bundren's eighteen-wheeler with Deputy Coats on July 24, 2006, where they found Dr. Surdacki's lab coat and State's Exhibit 33, a .380 caliber gun, which was unloaded.

## 2. Jones's Testimony

After the State rested, Jones's counsel informed the trial court that Jones planned to testify. Jones's counsel and the trial court both questioned Jones about whether he understood the consequences of his decision to testify, and Jones told them that he did.[7] Jones agreed that his counsel had informed him that he thought Jones should not testify.[8]

Jones told the jury that at no point had he displayed a firearm or threatened Dr. Surdacki. Rather, after the gold SUV rolled, Jones removed himself from the vehicle, put the gun in his waistband, and pulled his shirt over the gun before waving to the doctor. Jones said that instead of threatening the doctor, he had lied to Dr. Surdacki, telling him that his child was trapped in the

---

[7]The trial court granted the State's oral motion in limine that neither Jones nor his counsel should go into the sentences that Jones had received for the related offenses committed in Collin County because those were on appeal. Those sentences have since been affirmed. *See Jones v. State*, Nos. 05-07-01234-CR, 05-07-01235-CR, 2008 WL 4881121, at *1 (Tex. App.—Dallas Nov. 13, 2008, no pet.) (not designated for publication).

[8]Contrary to Jones's allegation in the unsworn statement attached to his pro se motion for new trial—that he felt compelled to testify on his own behalf because Cocanaugher and Self were not available to testify—nothing in the record indicates why Jones decided to testify.

10

SUV. While Dr. Surdacki jogged towards the gold SUV to help, Jones ran for Dr. Surdacki's vehicle, jumped into the vehicle, and drove off.

During cross-examination, Jones agreed that State's Exhibit 33, the semi-automatic gun recovered from Bundren's truck, was his gun, and he admitted that he had used it to steal Sulanc's gold SUV at Lowe's. Jones said that he had kept the gun's magazine in his shoe and that when he tried to take it out, he lost control of the gold SUV and it rolled. Jones stated that he had tried to remove the magazine from his shoe because he was getting ready to load it, intending to use the gun on himself. The gun broke in the wreck. Jones said that Dr. Surdacki had lied about Jones using the gun to take his vehicle, even though he agreed that Dr. Surdacki had no motivation to lie.

Jones said that he had tried to take Jiminez's car because he could not restart Dr. Surdacki's vehicle. Jones agreed that he had pulled a gun on Jiminez, but he denied putting a gun to Bundren's head or pointing it at her head. Jones conceded that Bundren had seen the gun because it was in his hand and that he had held the gun to her side. He admitted that he had told Bundren that he was going to kill her, but he claimed that he had let her go.

### 3. Jones's Motion for Continuance

At the conclusion of Jones's testimony on October 15, Jones's counsel made the following request outside the jury's presence:

> [Jones's counsel]: Okay. Mr. Jones, my client, has asked me to have two witnesses here. This was discussed Monday of this week. I had reviewed these two witnesses'[] statements prior to

11

coming to trial today, I mean, long ago. Each statement is one sentence. Okay? The witness—the first witness is Don N. Cocanaugher. . . . His written statement given to the Carrollton Police Department says—and this is about when Mr. Jones is taking Dr. Surdacki's car, and his statement says, "Drove up to accident and seen black person get in SUV and speed away." That's it.

The next witness, I believe, is a person that was with this Cocanaugher person. Her name is Rebecca Self . . . and her statement says, "Drove up behind SUV and saw person get into SUV and drive off." And, actually, her statement is two sentences. "The person was a black individual."

Mr. Jones and I disagree on this. I think these witnesses are unimportant to his case, would not add anything to his case. He wants these witnesses here to testify. I subpoenaed them. The subpoenas have not been returned served yet. I didn't know we'd get done this quickly, so I had them scheduled to show up tomorrow at 9:00.

Mr. Jones wants me to ask you that we be allowed to recess or have a continuance until I can see if these witnesses are going to be subpoenaed or they're going to be here at 9:00 tomorrow. And if they are going to be here, if I can get them here earlier, that they be allowed to testify either later today or at 9:00 on Thursday.

[Prosecutor]: May I, Your Honor?

THE COURT: Okay.

[Prosecutor]: Judge, my response to that is I would ask that you deny the continuance. First of all, [Jones's counsel] asked that question to the officer as to those witnesses. Second of all, in light of the Defendant's testimony where he just admitted that he carjacked Dr. Surdacki at the Lowe's (sic), I think it's moot.

[Jones's counsel]: I'm sorry, Judge. She didn't—he didn't carjack him at the Lowe's. I'm not trying to pick nits, but I want to make sure the record is correct. He carjacked Dr. Surdacki out on 544 in the middle of nowhere.

[Prosecutor]: Sorry. Carjacked Baki Sulanc at the Lowe's and the incident with Paul Palnau. In light of the Defendant's testimony, he said I don't deny what happened. I don't see how these

12

witnesses are going to be important in—and I don't see any reason for us or for the Court to continue this case for those two witnesses to be called, and I ask that you deny the motion for continuance.

[Jones's counsel]: Judge, if I may explain real quickly, he believes that they're important because obviously his story—the difference from Dr. Surdacki is that he did not have a weapon, and these two witnesses don't say anything about him having a weapon or anything. And my opinion, based on my training and experience as an attorney for ten years, is that they didn't see it, but they don't have anything to offer the other way. You know, they can't say, well, I'm for certain he didn't do that or he didn't have a gun. That's why I don't think they have anything to add to our case. But he is my client. He's asked me to do this. It's a difference in our opinion of his legal strategy.

THE COURT: Okay. As—from what you've read there, what they've said, I think that's in evidence from two different people, two or three maybe, but I—your client just said it, first off, I think, didn't he? Plus I'm sure the—I think Dr. Surdacki said that they didn't—all they—all they didn't see anything or something like that. They just saw him drive off.

[Jones's counsel]: And that's another reason, Your Honor, that I believe that—I mean, they don't add anything to our case, but, you know, I want to be—I want to zealously advocate for my client. He's asking for a continuance at this point so that I can try to wrangle these people up here. But—I me[an], it's my understanding I'm allowed to do certain things, you know, obviously in contravention of what he wants based on my—obviously, I can't keep him from testifying, but I can basically, you know, submit his legal strategy. And, Judge, I just ask that the two statements be entered for record purposes.

The trial court admitted the two witnesses' statements for record purposes. Cocanaugher's statement reads, "Drove up to accident and seen [sic] black person get in SUV and speed away." Self's statement reads, "Drove up behind SUV and saw person get into SUV and drive off. Person was a black individual." The trial court then stated, "[a]s far as the continuance to get these people here, I

13

think their testimony in effect would already be in evidence, so I'm going to deny the continuance." Jones rested after the trial court denied his motion for continuance.

### 4. Closing Arguments, Punishment, and the Return of the Subpoenas

During closing arguments, the State argued that the jury could consider Jones's other July 23 offenses for intent, motive, or identity. Jones's counsel responded that the State had brought the witnesses from the other offenses because it did not believe Dr. Surdacki's version of events and that the State hoped the jury would find Jones guilty because he had committed the other offenses. With regard to Cocanaugher and Self, Jones's counsel argued,

> You have two people driving up as he's getting in the vehicle, long flat stretch of road, *and they don't say anything about, you know, we saw a gun or we saw him, you know, getting a—Surdacki out of the car or anything like that*. You don't hear anything from those two witnesses. They don't tell the police anything about that. *They say, we seen him getting in the car and he drives off*.
>
> Well, who does that corroborate? Does that corroborate Surdacki or does that corroborate Mr. Jones's testimony? [Emphasis added.]

The State responded to Jones's counsel's attack on Dr. Surdacki's credibility by recounting all of the other evidence supporting Dr. Surdacki's version of events. The jury took thirty-six minutes to find Jones guilty of the offense as alleged in the indictment. The Cocanaugher and Self subpoenas were not returned unserved until after the trial had already concluded.

14

## C. Analysis

After being granted an out-of-time appeal by the court of criminal appeals, Jones filed a pro se motion for new trial in which he alleged that his trial counsel had been ineffective for not interviewing Cocanaugher and Self and complained that the trial court had abused its discretion by denying his motion for continuance to obtain Cocanaugher and Self as witnesses. There is no indication that Jones presented the motion for new trial to the trial court or secured a ruling on it. *See* Tex. R. App. P. 21.6. And instead of attaching to his motion for new trial affidavits from Cocanaugher and Self showing that they had been available to testify at trial and what they would have testified at trial, Jones attached his unsworn statement, which merely stated his belief that the two witnesses would have corroborated his version of events. We therefore have no record—beyond that created at trial—to review with regard to Jones's arguments about Cocanaugher and Self.

While the record contains extensive evidence supporting Jones's conviction, all we have with regard to Cocanaugher and Self are the following items: (1) their statements, which Officer Adamo paraphrased during Jones's counsel's cross-examination for the jury, that they drove up and saw a black person get in the vehicle and drive away; (2) Cocanaugher and Self's actual statements—which correspond to Officer Adamo's summary and which were entered for record purposes; and (3) Dr. Surdacki's testimony that Self and Cocanaugher were braking and stopping their truck as Jones took off in Dr.

15

Surdacki's vehicle and that they told him that they were under the impression that Dr. Surdacki had rolled the gold SUV and Jones had stopped to offer help.

Further, although the record contains some of Jones's counsel's reasoning for his actions with regard to Cocanaugher and Self, in that he had reviewed their statements and thought that they would not add anything to the case because "they don't have anything to offer" as far as seeing or not seeing any weapons, in his closing argument, Jones's counsel was able to argue that Cocanaugher and Self drove up as Jones was getting into Dr. Surdacki's vehicle, that they did not say anything about seeing a gun, and that their statements corroborated Jones's testimony because all they saw was Jones get in the vehicle and drive off. As postulated by the State, Jones's counsel might not have been able to make this argument if Cocanaugher and Self had actually testified at trial. And in light of the record before us, we cannot say that there is a reasonable probability that, but for Jones's counsel's deficiency—if any—the result of the trial would have been different. *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Davis*, 278 S.W.3d at 352; *see also Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (noting that counsel's failure to call witnesses at the guilt-innocence stage is irrelevant absent a showing that such witnesses were available and that appellant would benefit from their testimony). Therefore, we overrule the remainder of his second issue.

## IV. Due Process

Jones argues in his first issue that he was denied due process when the Denton County constable failed to serve subpoenas to Cocanaugher and Self. However, Jones did not raise this issue in his motion for new trial—the only point at which he could have raised it, as the subpoenas were not returned unserved until after the trial had concluded. *See* Tex. R. App. P. 33.1; *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) (stating that due process rights may be forfeited if not properly preserved); *see also Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004). And even if Jones had preserved this issue for our review, because—as discussed above—there is no showing that either witness would have testified to something material and beneficial to Jones's case beyond what was presented to the jury, we cannot say that Jones was harmed. *See Harrison v. State*, 187 S.W.3d 429, 433–34 (Tex. Crim. App. 2005). Therefore, we overrule Jones's first issue.

## V.  Conclusion

Having overruled both of Jones's issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: May 17, 2012